**MID–HUDSON LEGAL SERVICES, Plaintiff,**

**v.**

**G & U, INC., et al., Defendants.**

**No. 77 Civ. 3391–CSH.**

United States District Court, S. D. New York.

Nov. 16, 1978.

Mid-Hudson Legal Services, Inc., Poughkeepsie, N. Y. (Howard Schell Reilly and Anthony H. Szczygiel, Poughkeepsie, N. Y., of counsel), for plaintiff.

Meehan & Fink, Goshen, N. Y. (Robert W. Fink, Goshen, N. Y., of counsel), for defendants.

## MEMORANDUM OPINION

HAIGHT, District Judge:

Plaintiff Mid-Hudson Legal Services, Inc. ("Mid-Hudson"), a federally-funded legal services corporation which provides legal assistance and counseling to migrant farm workers, initially brought this action

against G & U, Inc., the operator of a farm in Orange County, N.Y. employing such workers, to gain access to defendant's camps for the purpose of advising and assisting workers resident therein. Defendant, in an incident occurring on June 13, 1977, had denied such access. After a hearing this Court permanently enjoined G & U from denying Mid-Hudson access to the camps, while rejecting Mid-Hudson's claims for compensatory and punitive damages. 437 F.Supp. 60 (S.D.N.Y.1977) ("*M–H I*"). Neither party appealed. Thereafter Mid-Hudson applied pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, for an award of attorneys' fees against G & U. This Court denied the claim, on the alternative grounds that the statute did not apply, and that in any event an award would be inappropriate. 443 F.Supp. 893 (S.D.N.Y.) ("*M–H II*"). The Second Circuit reversed, 578 F.2d 34 (2d Cir. 1978) ("*M–H III*"), holding that the claim fell within the statute, that this Court had applied an erroneous test in denying the claim, and remanding the case for an evidentiary hearing in accordance with *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468–74 (2d Cir. 1974) and subsequent authority. That hearing having been held, this opinion follows.

### I.

We start with certain principles and criteria declared by the Second Circuit and consequently binding upon this Court.

On the particular subject of awards of attorneys' fees under § 1988, the Second Circuit in *M–H III* teaches that the statute "must be applied broadly to achieve its remedial purpose"; that a successful plaintiff under § 1988 "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust" (quoting legislative history); and that at the evidentiary hearing mandated by *City of Detroit, supra,* the prevailed-upon defendant has "the burden of establishing what special circumstances, if any, render any such award unjust." 578 F.2d at 37–38. See also *Zarcone v. Perry,* 581 F.2d 1039 (2d Cir. 1978).

On the general subject of determining the reasonable amount of an attorney's fee, the Court in *City of Detroit, supra,* at 470–473, rejected "cumbersome rules" formulated by other tribunals [1] in favor of a streamlined analysis focusing primarily on the amount of attorneys' time spent on the case and the value of that time (what was done and by whom); and thereafter upon "other, less objective factors," of which "the foremost . . . is the attorney's risk of litigation," which turns upon such considerations as initial probability of success, novelty or complexity of the issues, and the like.

We consider these questions in order.

### II.

G & U, recognizing as it must that Mid-Hudson prevailed on a question of constitutional significance, nonetheless argues vigorously that "special circumstances" exist which should bar or substantially reduce an award of attorneys' fees.[2]

---

1. In *City of Detroit* the Second Circuit quoted earlier authority which listed these factors, together with "risk of litigation," as weighing upon the reasonable amount of an attorneys' fee:

   "(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government,
   (2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel,
   (3) time and labor spent,
   (4) magnitude and complexity of the litigation,
   (5) responsibility undertaken,
   (6) the amount recovered,
   (7) the knowledge the court has of conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial,
   (8) what it would be reasonable for counsel to charge a victorious plaintiff."

   "This conceptual amalgam," the Court said in *City of Detroit* at 470, "is so extensive and ponderous that it is probably not employed in any precise way by those courts espousing adherence to it."

2. The parties disagree as to whether "special circumstances" within the § 1988 context can operate only as a total bar (the "all or nothing"

In essence, G & U contends that "the conduct of the plaintiffs during the summer of 1976 and during the incident of June, 1977 was outrageous," to which G & U's denial of access "was nothing more than a natural response" (defendant's brief at p. 3). In these "special circumstances," it is said, Mid-Hudson has forfeited its right to attorneys' fees.

The circumstances giving rise to what this Court in *M–H I* characterized as "an unmistakable animus between the parties," 437 F.Supp. at 62, were explored at length during the recent hearing, which extended over three days and involved virtually every actor in the drama.[3] G & U contends that as the result of incidents occurring during the summer growing season of 1976 and the winter of 1977, those in charge of G & U had justifiably come to perceive Mid-Hudson personnel in general, and one of its staff attorneys, Howard Schell Reilly, in particular, as trouble makers, fomenters of dissatisfaction and unrest, *agents provocateurs,* and labor union organizers, all such activities being in contravention of Mid-Hudson's charter. That perception prompted Harold Utter, the president of G & U, to greet Reilly with the phrase "not you again" when, on the evening of June 13, 1977, Reilly and his colleague Anthony Szczygiel sought access to the camps, an access which Utter thereupon denied, thereby triggering this litigation. See *M–H I* at 437 F.Supp. 61. That denial of access, G & U urges in resisting the present application, was made in good faith, and in response to the aforesaid perception of Reilly as a trouble maker, compounded by the Utters' understandable resentment of foul, abusive

and threatening language which Reilly used during his visitations to the G & U office.

In addition, G & U argues that Mid-Hudson "set up" G & U as a target for a test case, and, consistent with that strategy, failed to make reasonable efforts to settle the dispute short of litigation.

Upon careful consideration of the evidence adduced at the hearing, I conclude that these several elements, singly or in the aggregate, are insufficient to establish those "special circumstances" which would bar or reduce an award of attorneys' fees under § 1988.

That is not to condone all aspects of Mid-Hudson's behavior. I find that, during his efforts to serve papers in an unrelated matter upon one of the Utter brothers at the farm in February of 1977, and during the June 13, 1977 incident underlying this litigation, Mr. Reilly used foul and abusive language to a substantially greater extent than he acknowledged in his testimony. Mr. Reilly has strong feelings and a short fuse. Contemplating his behavior, as revealed by the evidence and on occasion by courtroom demeanor, one is led to reflect upon the ease with which we may pass from pursuit of a rightful cause to the arrogance of the self-righteous. But Mr. Reilly's actions and speech, while at times excessive, were in part provoked by Mr. Utter's attempted evasion of service of process in February of 1977 (he refused to identify himself), and the defendant's intransigence on June 13. In any event, bad manners must rise (or sink) to a higher (or lower) level than that revealed by this record to

---

rule), or whether they may serve to reduce the award without eliminating it entirely. Plaintiff contends for the prior rule, and defendant for the latter, while pressing its initial contention that no award should be made. In the view I take of the case, I need not decide this question.

3. Mid-Hudson called as witnesses, either on its case in chief or in rebuttal, its executive director; two former managing attorneys of its Farm Workers' Project; the attorney in charge of the present case and his principal assistant; two paralegals; a law student assistant; another former staff attorney; and (as an expert

witness on "access cases"), an attorney outside the immediate Mid-Hudson family from Washington, D. C. G & U called as witnesses the partners of the firm defending it, Messrs. Meehan and Fink; the two Utter brothers, president and vice-president respectively of defendant corporation; one of defendant's supervisory staff; two other employees; and the executive director of the Farm Workers' Community Center of the Warwick Area Migrant Committee, a community body separate and apart from Mid-Hudson but concerned in the welfare of migrant workers.

constitute special circumstances depriving a successful civil rights plaintiff of statutory attorneys' fees.

As noted *supra*, G & U stresses certain incidents occurring in the summer of 1976. They are said to reflect improper activities at the farm and camps by Mid-Hudson, so as to explain in human terms, if not justify legally, the denial of access in June of 1977. The argument fails for two reasons. First, G & U has not proved improper behavior by Mid-Hudson in 1976. G & U witnesses testified that Mid-Hudson personnel were seen at the camps at the same time as one Oscar Nieves, a representative of the labor department of the Commonwealth of Puerto Rico; and also that representatives of the Cesar Chavez farm workers' union were at the camp at the same time as Mid-Hudson personnel. From these observations, G & U apparently drew the inferences that Mid-Hudson was acting as an agent of the Commonwealth in enforcing its own regulations regarding migrant workers from Puerto Rico; and that Mid-Hudson was aiding the union in soliciting membership. While such activities would undoubtedly fall outside Mid-Hudson's charter—it concedes as much—the evidence is far too tenuous to permit the inference that Mid-Hudson was in fact pursuing such activities. Joint presence at the camps is not enough. Mid-Hudson personnel frequently visited area camps, in aid of their "outreach" programs.[4] So, apparently, did Mr. Nieves and union officials. Joint presence does not prove

concerted action. Furthermore, Mid-Hudson could appropriately counsel Puerto Rican workers, at least initially, on questions arising out of their immigrant status, or all workers with respect to their right to join a union or bargain collectively. Thus the presence of Mid-Hudson personnel at the camps together with these other individuals, even if they were brought together by mutual concerns (and the proof of that is far from clear), falls short of demonstrating improper activity by Mid-Hudson. Mid-Hudson's witnesses specifically deny such activities falling outside its charter, or any improper tampering with G & U workers. I accept their evidence. G & U has not proved improper actions by Mid-Hudson in 1976.

Even had it done so, the incident with which this litigation is concerned occurred in June of 1977. There were administrative channels through which G & U could have protested Mid-Hudson's perceived 1976 activities. It did not do so. G & U does not even suggest that, when Reilly and Szczygiel appeared on June 13, 1977 to request the access to which they were constitutionally entitled, the situation was in any way complicated by the Commonwealth of Puerto Rico or the Chavez union.

I touched upon this point in my first judgment. Mid-Hudson argued at the hearing on the present application that what I said there[5] constituted the law of the case here, thus foreclosing G & U's effort to

---

4. Every Mid-Hudson witness talked about "outreach." It is the leading jargon expression of modern times for practically any social endeavor. William Zinsser of Yale, an authority on nonfiction writing, describes in *The New York Times Magazine* for November 12, 1978, at p. 30 ("Why Johnny's Teachers Can't Write") the beginning of his seminar in remedial writing, conducted for the benefit of administrators in the Greenwich school system:

"By good luck, on the day of my visit The New York Daily News had an article in which Mayor Koch's administration commented on its efforts to save Radio City Music Hall. 'We're doing a lot of outreach,' the Mayor's office told the press. 'We're looking at the broadest possible utilization.' This was typical of an institution sounding important and saying nothing. The jargon noun

'outreach' and the Latinate noun 'utilization' could mean any kind of reaching out and utilizing that a reader might want it to mean. It made a good text to start the day." ·

In the context of the present case, "outreach" means going into the camps and counseling the workers.

5. "The restrictive practice is justified in defendants' view by their right to prevent trespass and because plaintiffs are accused of acting outside the scope of their federal charter in that they foment labor unrest and impermissibly solicit clients in violation of 42 U.S.C. § 2996f(a)(5)(A).

"While there exists an unmistakable animus between the parties, defendants' allegations of plaintiffs' misconduct are unpersuasive." 437 F.Supp. at 61–62.

establish special circumstances. I admitted G & U's proffered evidence to permit it to show, if it could, that circumstances which failed to justify denial of access might, nonetheless, justify a denial of attorneys' fees incurred in establishing the right to access. I conclude, however, that no such circumstances are present.

G & U's last contention on this aspect of the case is that Mid-Hudson set up G & U, a leading grower in the area, as a litigation target, thereafter spurning any efforts at settlement. The Second Circuit has said, in its most recent consideration of attorneys' fees under § 1988, that district courts should consider "the presence or absence of any bad faith or obdurate conduct on the part of either party," *Zarcone v. Perry*, 581 F.2d 1039, 1044 (2d Cir. 1978). However, no such conduct is demonstrated by this record.

In the first place, G & U made itself a litigation target by its unjustified denial of access to Reilly and Szczygiel on June 13. I found in *M–H I* that G & U's posture on that evening represented a departure from the full access to the camps and workers previously granted to Mid-Hudson;[6] G & U thereupon became a target for litigation, but by virtue of its own acts.

█ As to settlement, the record shows that the parties' attitudes effectively foreclosed the possibility. Reilly testified, and I find, that on the evening of June 13 Harold Utter told Reilly that he would not be permitted back in the camp "this year," unless Reilly could show that he had a pre-arranged appointment with a particular worker. This statement on Utter's part reflected his determination to impose seasonal restrictions upon Mid-Hudson and its personnel. Timing was important for Mid-Hudson, since the most important services rendered by its farm workers' project take place during the growing season (April to November), while the migrant workers are in residence at the farms. Following the

June 13 confrontation, Mid-Hudson attempted to commence a settlement dialogue. The managing attorney of the farm workers' project, Gene Reibman, apparently dictated a letter on June 14, suggesting such a discussion, to Messrs. Meehan and Fink, attorneys for G & U (PX3). Messrs. Meehan and Fink deny any recollection of receiving that letter, and there is no concrete proof to the contrary; it is common ground, however, that a number of days after the June 13 confrontation, and before litigation had been commenced, Reibman telephoned Meehan to discuss the possibility of settlement. Meehan replied, in substance, that Mid-Hudson personnel could enter the migrant workers' camps, on condition that they did not have anything to do with questions concerning the labor policies of the Commonwealth of Puerto Rico or the Chavez union. Reibman refused to agree to such conditions or limitations, insisting instead upon unlimited access. I find, in all the circumstances, that Reibman's position was reasonable. As pointed out *supra*, it would be appropriate for Mid-Hudson to render assistance or advice to workers in certain respects, even within the contexts of the Puerto Rican labor law and collective bargaining. Reibman preferred, in my judgment reasonably, to insist upon that unlimited access to the camps which Mid-Hudson had enjoined in past seasons, leaving it to G & U to protest through presently-existing channels any excessive or improper activities. It is quite clear, given the ill will existing between the individuals involved, that any such general conditions as Meehan suggested to Reibman would carry within them the seeds of future and repeated controversy, as to whether or not the conditions had been violated.

Termination of the telephone conversation between Reibman and Meehan also terminated any further efforts, by either party, to settle the dispute. Mid-Hudson went ahead with preparation of its complaint and

---

6. "Defendants barred their access, however, and announced that the farm's policy would henceforth be to deny plaintiffs entry unless their visits were made at the request of a resident farmhand. Although plaintiffs had been allowed reasonable personal access to the migrants in the past, counsel at the hearing confirmed that the new policy would be followed in the future." 437 F.Supp. at 61.

papers in support of injunctive relief. G & U's counsel, although advised the day before of Mid-Hudson's intention to apply for a temporary restraining order, decided not to attend the hearing in chambers. Thus the final opportunity for a pre-injunction accommodation was allowed to pass by.

In these circumstances, I cannot characterize the behavior of either party within the context of possible settlement as being so obdurate as to bear upon the question of attorneys' fees. Not every case can be settled. Parties have the right to advance contentions of principle, and to require adjudication by the courts. That is what occurred here. The case cited by G & U on this point, *Naprstek v. The City of Norwich*, 433 F.Supp. 1369 (S.D.N.Y.1977), is distinguishable on its facts. In *Naprstek*, the plaintiffs succeeded in their constitutional attack upon a municipal ordinance forbidding children under 17 years of age from being on the streets of the city during certain hours of the night. Plaintiffs then applied for an award of attorneys' fees under § 1988. Judge MacMahon, in the exercise of his discretion, denied the application. Recognizing the success of their constitutional attack, the court nevertheless observed that the plaintiffs, "with the barest standing, were challenging an antiquated, poorly-drafted, rarely-enforced juvenile curfew ordinance." 433 F.Supp. at 1370. The court then observed:

"In addition, counsel for the City of Norwich indicated at the outset of this lawsuit that they would be willing to meet with plaintiffs' attorneys to discuss possible redrafting in a effort to correct the alleged deficiencies of the ordinance, but this offer was refused. The City Council, furthermore, nullified the curfew ordinance before the Court of Appeals rendered its decision. All of these factors indicate, in our opinion, that the threat to the public interest posed by this curfew ordinance was so insignificant compared to the threat posed by racial or alienage discrimination, that an award of fees would be unwarranted and unjust in this case. In short, we think that neither Congress nor the Supreme Court intended that private attorneys general need be encouraged to make mountains out of molehills. Nor do we think that Congress intended to reward attorneys for burdening federal courts with unnecessary litigation when they have not even attempted to remedy their clients' grievances by talking out their differences with duly constituted executive and legislative authorities at the local level.

"Section 1988 clearly permits the award of counsel fees in appropriate cases involving serious threats to constitutional rights, or effectuating congressional policies of high priority, but this is not such a case. Furthermore, we will not encourage a wholesale scramble by lawyers to challenge possibly thousands of ancient and ineffectual municipal ordinances, on the expectation that counsel fees must be awarded automatically." *Id.* at 1371.

In the case at bar, Mid-Hudson commenced litigation "to gain access to the workers at their place of abode in order to disseminate information and to provide legal assistance and counsel," for the purpose of implementing "a clear indication of the strong congressional interest in their welfare." *M–H III* at 36, 37. The question, in short, was one of considerable public significance. Secondly, there was no refusal on the part of Mid-Hudson to explore the possibility of settlement. Indeed, Mid-Hudson initiated a settlement dialogue in Reibman's telephone call to Meehan; while for the reasons stated that discussion achieved nothing, Mid-Hudson's behavior was reasonable throughout.

G & U's other authorities on the question of special circumstances are equally unpersuasive. For the most part, they arise in other circuits, and the denial of attorneys' fees may be explained by particular circumstances not present in the case at bar. Thus in *Sprogis v. United Airlines, Inc.*, 517 F.2d 387 (7th Cir. 1975), in which an airline stewardess brought a civil rights action claiming that the airline's no-marriage rule violated civil rights statutes, it appeared that the union representing the stewardesses was a real party in interest in the litiga-

tion. That union had previously agreed with the airline that, in consideration of revocation of the rule and reinstatement of stewardesses terminated under it, acceptance of reinstatement would be in full satisfaction of any grievance or complaint on the part of the stewardesses. The nominal plaintiff in *Sprogis* took the litigation position that she was foregoing the settlement and seeking back pay; but the union was using the case as a vehicle for all its members, which prompted the Seventh Circuit to observe that "when the union used the suit as an attempted class action vehicle to represent all its members, it was circumventing the substance of the agreement it made previously with United." 517 F.2d at 390. This was an important "special circumstance" which led to a denial of attorneys' fees. No such circumstance is present in the case at bar.

In its initial brief before this Court, G & U relied upon *Zarcone v. Perry*, 438 F.Supp. 788 (E.D.N.Y.1977), for the proposition that attorneys' fees are not recoverable under § 1988, where the plaintiff's claim "was basically a tort action couched in the language of a violation of the constitutional right to due process and that it only indirectly vindicated the public's right to due process." (Defendant's brief at 13). However, G & U can find no particular comfort in Judge Mishler's decision for the district court in *Zarcone*, since when the case reached the Second Circuit Judge Mansfield's opinion, while affirming the result, specifically states:

> "We therefore reject the view that, to be eligible for shifting of attorneys' fees, the civil rights plaintiff is obligated to show

that his action resulted in direct benefits to others, rather than in benefits solely to himself." 581 F.2d at 1042.

In *Zarcone* the Second Circuit held that even where the plaintiff's claim seeks to "redress an essentially private injury," the standards of the *Newman-Northcross* rule [7] may nevertheless apply, if issues of sufficient public importance are present. 581 F.2d at 1044 n. 6. The case at bar, of course, cannot be so characterized. Indeed, in *Zarcone* the Second Circuit made specific reference to *M–H III* as an example of a case vindicating the public interest. 581 F.2d at 1043 n. 5.

In sum, Mid-Hudson in this litigation vindicated and assured important rights accruing to migrant workers, thus implementing public policy as expressed by the Congress. It was unquestionably the "prevailing party" within the context of § 1988, and is accordingly entitled to attorneys' fees, unless the defendant sustains the burden of demonstrating "special circumstances" which would bar the award. Having considered the circumstances urged by G & U, together with other circumstances that might arise,[8] I conclude that there is nothing present in this record to bar or reduce Mid-Hudson's right to an award of attorneys' fees.

We turn, therefore, to the *quantum* of the award.

### III.

#### A. *Mid-Hudson's Claims*

■ Mid-Hudson claims attorneys' fees and expenses in respect of several periods

---

7. The "Newman-Northcross Rule" is derived from *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), and *Northcross v. Board of Education*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), which declare that civil rights plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman*, 390 U.S. at 402, 88 S.Ct. at 966. Congress specifically referred to this rule drafting § 1988. See *Zarcone* at 1042.

8. *Zarcone* suggests, for example, that the district courts should consider "any unjust hardship that a grant or denial of fee-shifting might impose." 581 F.2d at 1044. The evidence adduced at the hearing was that G & U is a large operation, grossing $3 million last year. No financial hardship arising from payment of plaintiff's attorneys' fees would appear to arise. Cf. *Skehan v. Board of Trustees of Bloomsburg State College*, 436 F.Supp. 657, 665–666 (M.D. Pa.1977).

of time and categories of activity. These may be summarized as follows:

(a) Costs, attorneys' fees, paralegal fees, and out-of-pocket expenses from the inception of the case through granting of the permanent injunction and initial application for attorneys' fees (June 13, 1977–November 30, 1977): $20,831.75

(b) Costs and attorneys' fees on appeal to Second Circuit of denial of attorneys' fees, and preparation for evidentiary hearing following reversal (January 9, 1978–October 3, 1978): 11,942.30

(c) Attorneys' fees for further preparation and conduct of evidentiary hearing: $ 6,005.00

Total Claim: $38,779.05 [9]

## B. *Mid-Hudson's Entitlement to Compensation for Efforts to Establish its Right to Attorneys' Fees*

At the threshold, G & U contends that Mid-Hudson cannot recover attorneys' fees for efforts expended in sustaining its right to such fees. G & U relies upon Judge Weinfeld's opinion in *Boe v. Colello,* 447 F.Supp. 607, 610 (S.D.N.Y.1978). In *Boe* plaintiffs successfully challenged a town licensing ordinance, and then applied for attorneys' fees under § 1988. Judge Weinfeld excluded from the time totals 10½ hours devoted to the preparation of the fee application, "as no benefit can possibly be said to redound to the plaintiffs from this effort . . . ."

With great respect, I do not believe that *Boe* requires exclusion of Mid-Hudson's efforts to recover attorneys' fees in the case at bar. In *Boe* Judge Weinfeld cited, as authority for the quoted proposition, the Second Circuit's opinion in *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102 (2d Cir. 1977). *City of Detroit* concerned attorneys' fees in a class action where counsel's efforts produced a settlement fund. Denying compensation for counsel's efforts in preparing and supporting its fee application, the Second Circuit followed Third Circuit authority, *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 110–111 (3rd Cir. 1976)

(*en banc*), and applied the principle "that fees may be taxed against the class under the equitable fund theory only for services actually conferring a benefit on the class." *City of Detroit* at 1102. The Second Circuit quoted the Third Circuit's observation that such services, while benefiting counsel, "do not benefit *the fund*—they do not create, increase, protect, or preserve it . . . ," *Lindy* at 111 (emphasis in original); and offered its own observation:

"Moreover, if counsel is allowed compensation for efforts to obtain his fee, any class member objecting to an initial award would risk increasing the total attorneys' fee—and thereby decreasing the class's fund—even though successful in pressing the objection." 560 F.2d at 1102.

These class action, "equitable fund" considerations are not present in the case at bar. To the extent that Third Circuit authority is persuasive, that Court recently distinguished *Lindy* in *Prandini v. National Tea Co.,* 585 F.2d 47 (1978), in which attorneys successfully prosecuting a Title VII class action were held entitled to compensation for time they expended in obtaining a reasonable fee. The district court had relied on *Lindy* in denying such compensation; the Third Circuit reversed:

"*Lindy* is an equitable common fund case. As such, attorneys' fees are paid out of the one fund, and any increase in the attorneys' fee award results in a decrease in the plaintiffs' recovery. The rationale behind the rule permitting awards of attorneys' fees out of the fund in such cases is that the attorneys' services benefitted [sic] the fund by creating, increasing, or preserving it. However, this is not an equitable fund case. The award here was statutorily authorized and was made pursuant to 42 U.S.C. § 2000e–5(k)."

\*     \*     \*     \*     \*     \*

"Since the statutorily authorized fees are not paid out of the plaintiffs' recovery and the attorneys, in seeking their fee are not acting in any sense adversely to the

---

**9.** Those figures are taken from Mid-Hudson's initial, supplemental, and second supplemental applications. They are analyzed and discussed in a somewhat different order *infra.*

plaintiffs' interest, the time expended by them in obtaining a reasonable fee is justifiably included in the court's fee award. If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for the hours expended on the case will be decreased. Recognizing this, attorneys may become wary about taking Title VII cases, civil rights cases, or other cases for which attorneys' fees are statutorily authorized. Such a result would not comport with the purpose behind most statutory fee authorizations, i. e., the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies. Indeed, courts have consistently held that attorneys may be awarded, under statutory fee authorizations, compensation for time spent on the fee application and successful fee appeals." 585 F.2d 52.

I find this reasoning persuasive and applicable by analogy to the case at bar. I am not aware of any Second Circuit authority to the contrary. There is authority in other circuits for compensatory time expended in applications for attorneys' fees where civil rights are vindicated. *Rosenfeld v. Southern Pacific Company,* 519 F.2d 527 (9th Cir. 1975); *Miller v. Amusement Enterprises, Inc.,* 426 F.2d 534 (5th Cir. 1970). I conclude that Mid-Hudson is entitled to reasonable compensation for its efforts in establishing its right to attorneys' fees and in quantifying the amount.

C. *The Reasonable Amounts of the Attorneys' Fees*

As mandated by *City of Detroit, supra,* at 495 F.2d 468–474, we start with the hours expended and the value of that time.

Mid-Hudson has submitted a series of affidavits setting forth the time by each staff member to the litigation. The affidavits are detailed with respect to dates, hours and activities, although no underlying diary entries or time sheets were submitted. As to value, Mid-Hudson's executive director, John Gorman (an attorney with a master's degree in social work) testified that on the basis of his experience with legal services programs, and interviews with public and private sector attorneys, he believed the following hourly rates were reasonable for Mid-Hudson staff attorneys, based upon years of experience in practice:

| Experience | Hourly Rate |
|---|---|
| 0–3 years | $55.00 |
| 4–6 years | $70.00 |
| 7 plus years | $80.00 |

The reasonableness of these rates was also attested to by affidavits obtained from a number of attorneys, unaffiliated with Mid-Hudson and qualified to express an opinion.

■ I find that the rates in question are in fact reasonable, and will apply them to the compensable hours in this case. It is of no legal significance that the Mid-Hudson attorneys' actual salary scales may have been quite different, or that Mid-Hudson does not charge for its services. Professional fee standards apply, without reduction because of the non-profit or "public interest" nature of the legal work performed. *Torres v. Sachs,* 538 F.2d 10, 13 (2d Cir. 1976); *Beazer v. New York City Transit Authority,* 558 F.2d 97, 100 (2d Cir. 1977), *petition for cert. granted,* 438 U.S. 904, 98 S.Ct. 3121, 57 L.Ed.2d 1146 (1978).

It is in respect of the first element—the amount of attorneys' time devoted to the case—that substantial questions arise. Time, to be compensable, must be reasonably and necessarily spent. Proof that time was in fact spent does not foreclose inquiry into the elements of reasonableness or necessity. To that inquiry the trial judge brings an independent mind, informed by his knowledge of the case and his past experience. In *Boe v. Colello, supra,* at 610, Judge Weinfeld summarized and applied the pertinent principles in revising *time spent* downwards so as to arrive at *compensable time:*

"The Court cannot accept that this case merited, much less necessitated, such a

substantial expenditure of time—especially by an attorney experienced in and familiar with the issues presented. Substantively, the questioned ordinance was so clearly unconstitutional that the Court found it to 'run riot in violation of First Amendment rights of freedom of press and speech.' And although the procedural questions of abstention and comity presented more complex issues, the Court's own research was what permitted it to even reach the merits.

"This Court's experience, both at the bench and bar over extended years, qualifies it to estimate the time reasonably required by plaintiffs' claims in terms of research, analysis and drafting of various documents. Moreover, the Court's own research, study and analysis of the respective contentions of the parties further afford some yardstick by which to measure plaintiffs' attorney's allegations of the time factor. Any expenditure of time beyond that which is reasonably required suggests either inexperience and devotion of more time than warranted to fairly and properly present claims or, alternatively, that the attorneys, however experienced, engaged in dilettantism; a losing side is not required to pay for such indulgences."

Application of these principles to the case at bar requires some degree of reduction. The litigation will be considered in stages.

1. *From the Inception of the Case Through Issuance of the Permanent Injunction.*

■ The confrontation at the G & U camp took place on June 13, 1977. Mid-Hudson filed its complaint and motion for a temporary restraining order on July 13, 1977. The passage of a full month is somewhat surprising, in view of the urgency with which Mid-Hudson viewed the farm workers' seasonal needs. The affidavits and testimony assert that, during this month, the three attorneys responsible for the farm workers' project—Reibman, Reilly and Szczygiel—collaborated on preparation of the complaint and motion papers. Reilly, in charge of the case, took the laboring oar; Reibman was his supervisor and Szczygiel his associate. The following attorneys' hours are claimed for the period June 13 through July 13, 1977, the date when litigation was commenced:

| | |
|---|---|
| Reilly: | 101.5 |
| Reibman: | 8 |
| Szczygiel: | 8 |
| Total: | 117.5 hours |

The activities described consist for the most part of "conferences," "research and drafting" of the complaint and order to show cause, and "proofing and correcting" drafts. There is a relatively minor amount of time for travel to the area of the camps, in order to obtain measurements and photographs in support of Mid-Hudson's "company town" theory. Travel time to New York to file the complaint is also included.

The end result of 117.5 hours of attorneys' time was an 18-page complaint, an order to show cause seeking injunctive relief, and a brief and affidavits in support thereof. These documents, while carefully prepared, were not voluminous.

Plainly this record reflects, in Judge Weinfeld's word, certain "indulgences." What Mid-Hudson's attorneys had to do during this period of time was decide they had been wronged; decide upon their position; and draft papers setting forth that position and a prayer for relief. To achieve those initial objectives, 101.5 hours of Mr. Reilly's time is claimed: the equivalent of 16.9 days at 6 hours work per day. That amount of time is much more than was reasonably necessary to formulate and state Mid-Hudson's position. The issues were not that complex. Mid-Hudson was able to demonstrate without undue difficulty (no evidentiary hearing was necessary) that G & U had denied its attorneys access to a "company town." The plaintiffs' entitlement to injunctive relief followed under what I

characterized as "well established" principles, *M–H I* at 62, citing *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) and other authority.

Taking these factors into account, I conclude that a fair and reasonable amount of time required by the attorney in charge of the litigation to develop the facts, draft the initial papers, and travel to New York to file them would have been 48 hours—6 hours a day for 8 days, 3 of those days being devoted to travel (in the area and to New York), and 5 days for research and drafting of pleadings.

I allow Mr. Reibman's 8 hours and Mr. Szczygiel's 8 hours during this period. It was appropriate that Mr. Reibman supervise and that Mr. Szczygiel contribute to the effort.

The next sphere of activity covers events subsequent to filing of the initial papers and culminating in issuance of the permanent injunction. The Court denied a temporary restraining order and set the injunction motion down for hearing on July 20, 1977. Mid-Hudson was directed to submit a further brief on the questions of standing and allegedly improper solicitation, issues raised by G & U at the hearing. Mid-Hudson, working under some time pressure, produced an effective brief. The Court issued its order for a permanent injunction on July 26, 1977. Mid-Hudson's attorneys arranged for the service of the order, the settlement of a judgment, assessed its damages claim (later abandoned) and considered questions of appealability. The hours claimed during this period, running from July 15 to August 4, 1977, are as follows:

| | |
|---|---|
| Reilly: | 51 |
| Reibman: | 5.75 |
| Szczygiel: | 29.5 |
| Total: | 86.25 hours |

I will allow this time as reasonably and necessarily spent. It related to preparation for and attendance at a court hearing, necessary litigation steps, and the production of a well-researched, 33-page brief, on short notice, rebutting questions raised by G & U. To meet the briefing deadline, Reilly and Szczygiel divided the points.

2. *From Issuance of the Permanent Injunction Through Initial Fee Application Proceedings in This Court.*

Following issuance of the permanent injunction, Mid-Hudson turned its energies to its fee application to this Court. The presentation was solely on affidavits and briefs, the Court in *M–H II* denying the application as a matter of law on January 26, 1978. The period with which we are presently concerned runs from August 8 to January 13, 1978. The attorneys' hours claimed for that period are as follows:

| | |
|---|---|
| Reilly: | 78.25 |
| Reibman: | 7.75 |
| Szczygiel: | 36.5 |
| Total: | 122.5 hours |

This combined effort produced a series of affidavits detailing the prior activities of the individual attorneys; a 20-page brief; a 7-page reply affidavit by Mr. Reilly; and a 7-page reply brief.

3. *From This Court's Denial of Attorneys' Fees Through Reversal by the Second Circuit.*

Following this Court's denial, on January 26, 1978, of the application for attorneys' fees, Mid-Hudson prosecuted a successful appeal to the Second Circuit. The pertinent period of time extends from February 9, 1978 through June 30, 1978. The described activities are conferences; researching and drafting the appellate brief and appendix; checking proofs; preparation for and presentation of oral argument (by Mr. Reilly); and analysis of the Second Circuit's opinion. The attorneys' hours claimed are:

| | |
|---|---|
| Reilly: | 97.25 |
| Szczygiel: | 15 |
| Total: | 112.25 hours |

Consideration of sub-categories (2) and (3) together reveals that in order to *estab-*

lish its right to attorneys' fees (unsuccessfully in this Court, successfully in the Court of Appeals), Mid-Hudson attorneys claim a total of 234.75 hours. At the rates charged for the individuals in question, the fees charged on this aspect of the case total $15,737.50.[10]

At first blush, the amounts of time claimed appear high. That is at least my impression with respect to the proceedings in this Court (sub-paragraph 2). I approach with some deference the question of the amount of time reasonably necessary to reverse one of my own judgments in the Court of Appeals (sub-paragraph 3). That Court may have its own view if it considers this case again. There may be some duplication or "indulgences" here. Nevertheless, I am not disposed to reduce these amounts. Mid-Hudson's right to attorneys' fees presented a more difficult question than its initial right to injunctive relief. I might be expected to think so, having fallen into what the Second Circuit views as error in denying them. But § 1988 is a new statute, and *M–H III* the first case interpreting it so as to grant attorneys' fees to counsel who, at least on the pleadings, sued to vindicate their own rights rather than those of clients. To reach that result the Second Circuit analyzed the legislative purpose and concluded, in effect, that this Court had exalted form over substance, thereby thwarting that purpose. It is a significant decision in a previously uncertain area. While Mid-Hudson specifically disclaims

any claim to a premium rate (reply brief at p. 6), cf. *City of Detroit, supra*, at 495 F.2d at 471, *Beazer, supra*, at 100, I may nonetheless consider the novelty, complexity and importance of the underlying issues in determining whether attorneys' time was reasonably and necessarily spent. Having done so, I allow in full the time claimed to establish Mid-Hudson's legal right (subject to "special circumstances") to recover attorneys' fees.[11]

4. *From the Second Circuit's Reversal to Completion of the Evidentiary Hearing.*

Following the Second Circuit's declaration of its right to attorneys' fees, Mid-Hudson prepared for and participated in the evidentiary hearing to establish the *quantum.* G & U resisted all the way, asserting "special circumstances," duplication, and waste of time. Mid-Hudson's attorneys testified, were cross-examined, cross-examined G & U witnesses, and submitted further affidavits and briefs. The hours claimed in these efforts are as follows:

| Reilly: | 49 |
|---|---|
| Szczygiel: | 23 |
| Cook: | 35.5 [12] |
| Total: | 107.5 hours |

I find that this time was reasonably and necessarily spent. The amount of fees, based upon the applicable hourly rates, is $6,115.[13]

10. Reilly: 175.5 hours at $70 = $12,285; Reibman: 7.75 hours at $80 = $620; Szczygiel: 51.5 hours at $55 = $2,832.50.

11. I am mindful, in this regard, of Mid-Hudson's claim that the granting of the injunction had far-reaching·and important effects upon other employers and migrant workers. I am persuaded, however, that this dispute and confrontation were between Mid-Hudson and G & U only. No evidence was adduced at the hearing that any other employer had denied full access to Mid-Hudson. The concern of Mid-Hudson that G & U's denial might spread to other growers is speculative. It apparently did not occur during the period between G & U's denial of access on June 13, 1977 and issuance of the injunction on July 26. No doubt the

decision furnishes welcome precedent, but there is no factor present which requires the award of a premium above and beyond the time reasonably and necessarily devoted to the task.

12. Thomas S. Cook is a law school graduate employed by Mid-Hudson, not yet admitted to the bar. Mid-Hudson values his time at $40 per hour, an amount I find to be reasonable.

13. Reilly: 49 hours at $70 = $3,430; Szczygiel: 23 hours at $55 = $1,265; Cook: 35.5 hours at $40 = $1,420.

D. *Summary of Awards of Attorneys' Fees*

For the foregoing reasons, the Court awards attorneys' fees to Mid-Hudson as follows:

(1) Commencing suit and obtaining permanent injunction: $10,092.50 [14]

(2) Establishing right to attorneys' fees: 15,737.50

(3) Establishing *quantum*: 6,115.00

      Total: $31,945.00

### IV.

In addition to the foregoing attorneys' fees, I allow out-of-pocket expenses of $126.75; [15] paralegal fees of $60; [16] and the filing fee in this Court of $15. I am also asked to award costs in the Court of Appeals, totalling $377.30, but respectfully leave to that forum the taxation of costs before it. In consequence the award of costs in this Court totals $201.75.

### CONCLUSION

Mid-Hudson is entitled to recover from G & U attorneys' fees in an amount of $31,945 and costs in an amount of $201.75, or a total of $32,146.75.

Settle judgment on notice.

---

**14.** Reilly: 99 hours (48 plus 51) at $70 = $6,930; Reibman: 13.75 hours (8 plus 5.75) at $80 = $1,100; Szczygiel: 37.5 hours (8 plus 29.5) = $2,062.50. See pp. 271–272 *supra*.

**15.** Reilly: $122.68; Wood (paralegal) $4.07.

**16.** Debra Wood, a paralegal, worked on preparation of the show cause papers. G & U questions the propriety of an award for paralegals. I allow the item, representing 4 hours reasonably valued at $15 per hour. The use of paralegals saves lawyer's time and consequently money. It should be encouraged, not the reverse.