651 F.2d 214
 Jean M. BONNES, Christopher Camuto, Farmworkers' Legal
Project of the American Civil Liberties Union of
Virginia, Inc.; Migrant and Seasonal
Farmworkers Association, Inc.,
Appellants,
v.
Edwin R. LONG, Ralph E. Long, Appellees.
 No. 80-1044.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 10, 1980.
Decided March 18, 1981.
 
 Stephen W. Bricker, Richmond, Va. (Bricker & Zerkin, Richmond, Va., on brief), for appellants.
 Daniel Hartnett, Accomac, Va. (Ayres, Hartnett & Custis, Accomac, Va., on brief), for appellees.
 Before WINTER, PHILLIPS and MURNAGHAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 This is an appeal from the district court's decision denying an award of attorney's fees to plaintiffs under 42 U.S.C. § 1988. The district court rendered its decision following an evidentiary hearing on plaintiffs' right to attorney's fees that was mandated by our earlier remand of this case. See Bonnes v. Long, 599 F.2d 1316 (4th Cir. 1979). Finding that the conclusions that the district court drew from its findings of fact made on the basis of that hearing are erroneous, we reverse its order denying the award and remand with directions to award an appropriate amount to be determined by the court.
 
 
 2
 * Because decisions on the award of attorney's fees are peculiarly dependent upon the facts of each case, a brief review of the litigation that led to this appeal is appropriate. The plaintiffs the Migrant and Seasonal Farmworkers Association, Inc. (MFSA), the Farmworkers' Legal Project of the American Civil Liberties Union of Virginia, Inc. (FLP) and an employee of each organization brought suit against the defendants father and son owners of a large vegetable farm on the Eastern Shore of Virginia in the United States District Court for the Eastern District of Virginia. In this suit under 42 U.S.C. § 1983, the plaintiffs sought $5,000 in compensatory damages and $10,000 in punitive damages from the defendants, as well as injunctive relief. They alleged that the defendants had denied the plaintiffs access to migrant workers, conspired to deprive the migrant workers of their constitutional and statutory rights, caused irreparable harm to the migrant workers and prevented free association and expression of views.
 
 
 3
 As the result of a hearing on a motion for a temporary restraining order and preliminary injunction, the district court entered a consent order. This order provided that the defendants were to refrain from hindering or interfering in any manner with plaintiffs' access for any lawful purpose to the migrant labor camps located on defendants' land; the MFSA was to provide reasonable notice to defendants, except in emergency situations, before entering upon defendants' land for the purpose of providing its services to migrant workers; the FLP was to provide reasonable notice to defendants before entering upon defendants' land for the purpose of conveying general information concerning available legal services, but no such notice was required when the FLP was responding to specific requests for assistance, when responding to specific complaints, or when entering for the purpose of interviewing actual or potential witnesses or clients. No evidence concerning the facts underlying the dispute was adduced by the court or offered by any of the parties to support this judgment.
 
 
 4
 The plaintiffs then moved the district court for an award of attorney's fees under 42 U.S.C. § 1988, and this motion was denied. The plaintiffs appealed to this court, and the matter was remanded with instructions for findings of fact on whether plaintiffs were entitled to attorney's fees. See Bonnes v. Long, 599 F.2d 1316.
 
 
 5
 The evidence adduced at the hearing on remand tended to show that the MFSA is one of the "CETA 303 prime sponsors" that Congress has authorized to provide, either directly or through purchase-of-services arrangements, manpower services, which include out-reach and intake and assessment, 29 C.F.R. § 97.233(c)(4)(iii)(A)(1) & (2), and supportive services, which include legal services, 29 C.F.R. § 97.233(c)(4)(iii)(C)(12). See 29 U.S.C. § 873. At the time this action was initiated, the MFSA had entered into a purchase-of-services arrangement with the FLP to provide certain legal services to the migrant and seasonal farmworkers in Accomac and Northampton Counties, Virginia. One of the objectives of the MFSA was admittedly to draw migrant farmworkers out of the fields and into vocational training programs that would open up new occupations to these workers, and the MFSA's funding was in part based on the number of farmworkers that they could interest in these programs. The legal services that were to be provided by the FLP were limited to representing farmworkers in cases involving significant farmworker issues and to providing information and education to farmworkers concerning their legal rights. They were not, for example, to represent farmworkers in ordinary criminal cases.
 
 
 6
 Because virtually all the migrant farmworkers on the Eastern Shore of Virginia reside during the harvest season in labor camps located on farmers' property, both the MFSA and the FLP found it necessary, in order to provide their social and legal services, to visit the farmworkers at the labor camps when the farmworkers were not working. The plaintiffs admitted that prior to 1977 they had never been denied access to defendants' farm for the purpose of communicating with migrant farmworkers. In late August and early September 1977, however, the plaintiffs contended that the defendants totally denied the plaintiffs access to their farm.
 
 
 7
 On August 31, 1977, defendant Ralph Long (the father) visited the FLP office and had a brief discussion with C. Cooper Geraty, supervising attorney of the FLP, concerning the access of FLP employees to the migrant farmworkers residing in the labor camps on defendants' farm. The evidence concerning the content of this discussion is in conflict. Geraty testified that defendant Long categorically refused to allow employees of the FLP to enter upon his property to speak to the farmworkers. Defendant Long, on the other hand, testified that he stated that the FLP employees would be allowed to enter upon his land following the provision of notice. Although crew leader Blanding and farmworker Lopez were also present at this meeting, Blanding was inexplicably not called to testify at the hearing on attorney's fees and Lopez, who did testify at the hearing, was not questioned about this incident.
 
 
 8
 On September 1, 1977, ostensibly in response to requests for services from farmworkers, Chris Camuto of the MFSA and Jean Bonnes of the FLP went to the Long farm. They checked in at the office at the entrance to the farm and, finding that neither of the Longs was present in the office, left word they were proceeding to one of the labor camps. Arriving at the labor camp, they found already present a Catholic nun who was a representative of an organization that provided health services to the migrant farmworkers.
 
 
 9
 Camuto and Bonnes had been about their tasks a short time when crew leader Blanding and the Longs, father and son, arrived. A heated discussion ensued in which Camuto, Bonnes and the nun were questioned about the reason for their presence on the Long farm and in which Camuto and Bonnes were accused by the Longs of encouraging the farmworkers to file complaints about their working conditions and generally disrupting their work.
 
 
 10
 Camuto testified that the elder Long then ordered Camuto and Bonnes off the farm and told them they would be arrested for trespassing if they returned without a court order. Although the Longs contended that they first told Camuto and Bonnes that they were only upset about the two coming on the property without first notifying the Longs personally, both the Longs admitted that the elder Long had categorically ordered Camuto and Bonnes off the Long property and told them not to come back without a court order. Suit was filed against the Longs within four or five days after this incident.
 
 
 11
 Based on substantially the foregoing evidence, the district court made its findings of fact. Specifically, the district court found that prior to 1977 the Longs had told the MFSA and FLP that their workers could come on the Long property if they first checked in at the farm office. The court further found that this request was a reasonable one.
 
 
 12
 The court then found that one of the admitted aims of the MFSA was to take migrant farmworkers out of the fields and put them in other employment, and that funding for the organization was based on the number of farmworkers that they so converted. The court also found that the MFSA and the FLP were soliciting complaints from the farmworkers and that this activity did have a tendency to be disruptive of the work force. The court also noted that the activities of the MFSA and the FLP had resulted in a reduction of Blanding's crew from approximately thirty farmworkers in June to approximately eight workers by the end of September and that this diminution in labor did threaten the Longs with a substantial economic loss, which in fact was realized when the Longs were unable to harvest all their sweet potato crop in 1977.
 
 
 13
 The court, therefore, found that Mr. Long was understandably upset when he spoke with Geraty on August 31, 1977 and that as a result he may have made excessive statements about the access of the FLP to his farm that he did not really mean. The court also found that Geraty's youthful zeal for his cause may have colored his perception of the conversation.
 
 
 14
 With respect to the September 1, 1977 confrontation, the district court found that the Longs may have made excessive statements because Camuto and Bonnes did not wait at the farm office for the Longs or seek out the Longs to talk with them. These statements, however, were found to be "the logical solution to the problem, and that is that they have a court order that would spell out what, in effect, had been the Longs' prevailing practice all along."
 
 
 15
 The court ultimately found that the defendants' "prevailing practice all along" was to permit access after reasonable notice. Because the consent judgment, therefore, had done little more than incorporate the status quo in a court order, the court concluded that the defendants were the prevailing parties and that, therefore, plaintiffs were not entitled to attorney's fees under 42 U.S.C. § 1988.
 
 II
 
 16
 In our previous remand of this case to the district court for findings of fact, we suggested that the district court focus on "the precise factual/legal condition that the fee claimant has sought to change or affect so as to gain a benefit or be relieved of a burden. With this condition taken as a benchmark, inquiry may then turn to whether as a quite practical matter the outcome ... is one to which the plaintiff fee claimant's efforts contributed in a significant way, and which does involve an actual conferral of benefit or relief from burden when measured against the benchmark condition." Bonnes v. Long, 599 F.2d at 1319; see F. & M. Schaefer Corp. v. C. Schmidt & Sons Inc., 476 F.Supp. 203, 206 (S.D.N.Y.), aff'd, 597 F.2d 814 (2d Cir. 1979) (district court, citing Bonnes, stated that appropriate benchmark in determining prevailing party was situation immediately prior to suit). To determine the benchmark condition in the present case, the district court was required to conduct a hearing to determine what was said at the August 31 and September 1 confrontations between the parties.
 
 
 17
 The district court's findings of fact with respect to these incidents cannot be upset, of course, except upon a finding that they were clearly erroneous. Even if we accept those findings as correct, however, we believe that it was error for the district court to conclude that the plaintiffs' institution of suit in this case did not result in the "actual conferral of benefit."
 
 
 18
 At the very least, the consent order entered by the district court remedied the state of uncertainty that the plaintiffs had been forced to go to court to resolve. All the witnesses to the September 1, 1977 incident, including both the Longs, testified that the elder Long told plaintiffs Camuto and Bonnes not to return to the Long property without a court order. Having put the plaintiffs to the time and expense of litigation in order to clarify their rights, the Longs cannot now be heard to complain about bearing the cost of that measure, even if, as the district court concluded, the court order did nothing more than "spell out what, in effect, had been the Longs' prevailing practice all along."
 
 
 19
 Moreover, we believe that this latter conclusion by the district court was in error. The district court found that prior to suit the plaintiffs were permitted to enter on defendants' property only on the giving of reasonable notice. Under the consent judgment, however, the MFSA was permitted to come on defendants' property without notice in emergency situations, and the FLP was given the same unfettered access when responding to specific complaints or when entering for the purpose of interviewing actual or potential witnesses or clients. While the MFSA's increased right to access might be regarded as a de minimis deviation from the status quo, the unconditioned access afforded the FLP by the consent judgment would presumably cover the majority of its visits to the Long farm, including, for example, the visit that led to the September 1 confrontation.
 
 
 20
 In the opinion remanding this case after the original appeal, this court noted that "(a) plaintiff need not prevail on all issues if a significant one is resolved so as to achieve some of the benefit sought through the litigation." Bonnes v. Long, 599 F.2d at 1318. The FLP's unconditioned access to the Long farm in a variety of circumstances certainly seems to fall within this category. It was error, therefore, for the district court to conclude that the plaintiffs were not prevailing parties because the consent order did nothing more than incorporate the Longs' prevailing practice.
 
 
 21
 Assuming that the plaintiffs were the prevailing parties, the question remains whether there were any "special circumstances" in the instant case on which the district court might have based a denial of attorney's fees to the plaintiffs. See Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam). Although the activities of the MFSA and the FLP might have made the conduct of the Longs "understandable," they could not have been considered against those organizations as "special circumstances" justifying the denial of attorney's fees inasmuch as those activities were authorized under federal law. See 29 U.S.C. § 873; 29 C.F.R. § 97.233(c)(4)(iii)(A)(1) & (2); id. (c)(12).
 
 
 22
 In addition, even the belligerent and intentionally provocative statements of a worker who, like the MFSA and FLP employees, was attempting to provide service to migrant farmworkers residing in labor camps on private property was found in Mid-Hudson Legal Services v. G & U, Inc., 465 F.Supp. 261 (S.D.N.Y.1978) (Mid-Hudson IV ), not to constitute "special circumstances" sufficient to support a denial of attorney's fees under 42 U.S.C. § 1988. Although the Mid-Hudson IV court regarded as "justifiable" the defendant farm owner's perception of the plaintiff legal services workers as "trouble makers" and "fomentors of dissatisfaction and unrest," it concluded that that perception did not support the denial of attorney's fees in that case. Mid-Hudson IV, 465 F.Supp. at 264. Given the similarity of the factual settings, we think a similar conclusion is warranted in this case.
 
 
 23
 Having concluded that the plaintiffs were prevailing parties and that no "special circumstances" existed on which to base a denial of attorney's fees, we reverse and remand for a determination by the district court of the appropriate amount of fees to which the plaintiffs are entitled, including, of course, attorneys' fees for the services of their attorneys on this appeal.
 
 
 24
 REVERSED AND REMANDED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 25
 The facts are usually paramount; the law is often but their hand-maiden. My dissent should not be viewed as disagreement with what the majority has stated the law to be. It is simply that the district judge read the facts differently; he was not clearly erroneous, and, in my judgment, the substitution of different conclusions from his findings represents an invasion across the line of demarcation between the functions of a trier of fact and those of appellate judges.
 
 
 26
 The controversy arose in late August and early September, 1977. Prior to that time, the parties lived, without incident, under a tacit agreement that social workers (the Migrant and Seasonal Farmworkers Association, Inc.) and providers of legal services (the Farmworkers' Legal Project of the American Civil Liberties Union of Virginia, Inc.) would have free access to farmworkers living at migrant quarters at the farm of the Longs, provided only that prior notice of the visit was given.[1]
 
 
 27
 During the 1977 season, visits by the social workers and the providers of legal services occurred without compliance with the prior notice requirement. Often the express purpose, consistent with a Federal program to encourage termination of current employment and retraining for full-time job capability in preference to seasonal crop-picking, was to solicit the farmworkers to leave their employment on the Longs' farm. The September 1, 1977 confrontation grew out of such an effort in the course of an unnotified visit.[2]
 
 
 28
 The dispute which ripened into a law suit, consequently concerned exclusively a disagreement over whether the social workers and legal services providers should have given prior notice on the occasion of a general solicitation visit. They were on the premises without notice. Nothing established that there was ever any actual instance, any case or controversy, where the parties had differences over a visit in response to specific requests for assistance or to specific complaints or for the purpose of interviewing actual or potential witnesses or clients.
 
 
 29
 In that context, which was confined to an unannounced entry on the land of the Longs to solicit for a retraining program, the elder Long told the "visitors" to leave and not to return without a court order. One could hardly interpret that evidence as other than a statement by Long that he did not agree to unnotified visits for the purposes of solicitation. In all events, it is a permissible interpretation, and the one the district judge made.
 
 
 30
 When Long referred to a court order, he showed some appreciation for the fact that recourse to a peaceful manner for settling a dispute is preferable to self-help, and the probable ensuing violence, which could be expected in the confrontation between the Longs, Bonnes, Camuto and the Catholic nun.
 
 
 31
 The matter came on for hearing on motions for a temporary restraining order and a preliminary injunction, whereupon, assisted by the court, the parties agreed on the form of a consent decree. It called for reasonable notice before entering, except:
 
 
 32
 1. in the case of the social workers, "in emergency situations;"[3] and
 
 
 33
 2. in the case of the legal services providers, "when responding to specific requests for assistance, when responding to specific complaints or when entering for the purpose of interviewing actual or potential witnesses or clients."
 
 
 34
 So far as the dispute between the parties was concerned, the Longs therefore won. On the sole occasion when they insisted that the plaintiffs leave the premises, the consent decree upheld their action, for reasonable notice had not been given. The District Judge motivated by a sensible wish to avoid controversy for the future, and perhaps recognizing that the consent decree would be more palatable if the plaintiffs appeared to "get something," included the exceptions in the consent decree. However, no factual situation had yet arisen creating any dispute in the context of an emergency or of a specific purpose visit. The exceptions were in the nature of prevention, not cure.
 
 
 35
 As pointed out in Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 418, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978), construing the essentially identical language of § 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k):
 
 
 36
 Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law.
 
 
 37
 The Longs were not in that category when suit was brought, or, so far as the record is concerned, at any subsequent time. The Supreme Court evidently assumed it was addressing the problem of an actual violator, not a potential violator.
 
 
 38
 In that posture, I submit that Judge Clarke's factual finding that the defendants, not the plaintiffs, were the prevailing parties, was not clearly erroneous.
 
 
 39
 An unfortunate factor in all this is the premium Christiansburg appears to place on the status of an applicant for attorney's fees as plaintiff or defendant. The parties, at the end of the September 1, 1977 confrontation, all understood that a resolution by lawsuit was necessary because they were in direct conflict over whether the Longs were entitled to reasonable notice when the purpose of a visit was solicitation. The Longs could have filed the lawsuit, seeking declaratory relief. I doubt that they would have been given, as plaintiffs, as tender care as the majority has accorded Bonnes, Camuto and the two corporations, one with a focused interest on providing social services, the other directing its attention to provision of legal services.
 
 
 40
 The point is that the consent decree concerned two factual situations: one real, the other hypothetical. The Longs were the victors in the real case. That made them, as the district court found, the prevailing parties. Alternatively, the nonexistence of any true case or controversy under the supposed possible set of facts on which Bonnes, et al. "won," makes it appropriate to conclude that there were special circumstances authorizing the exercise of discretion by which the district judge denied the requested award of counsel fees. The case was one for which there was no factual basis, although we may assume that, had there been the essential factual substructure, the statement of the law as to specific or emergency visits would be correct. Cf. Christiansburg, supra, at 420, 98 S.Ct. at 699: "... Congress ... wanted to protect defendants from burdensome litigation having no legal or factual basis." (Emphasis added.)
 
 I would affirm.[4]
 
 
 [1]
 Notice does not involve a request for or receipt of prior consent to or approval for the visit. The record establishes that only notice was required
 
 
 [2]
 Plaintiffs sought to establish that the visit on that date was within the "specific purpose" exception to the notice requirement spelled out in the consent decree, but the District Judge manifestly did not accept that version
 In that connection it serves a useful purpose to review the testimony. First consider that of the MSFA and its employee Camuto. He flatly acknowledged that on the occasion of the September 1, 1977 encounter, his purpose was solicitation:
 CAMUTO: I arrived at the camp and parked the car, got out and started introducing myself to the people that I saw there who were sitting around they were not working. They were actually in the camp, sitting in front of their doors and gave a brief description of who I was and was there anyone interested in
 There was some ongoing program at the time that we were particularly interested in telling people about. I don't remember exactly what that was.
 But the gist of my conversations with the workers was about whatever that training program happened to be, and a few of them said they weren't interested, and then I started talking to one man who did express an interest and said he did want to be enrolled.
 As to the effects of the solicitation his testimony was:
 CAMUTO: As far as I could tell in that office and in managing my program and evaluating what we were doing from our own point of view and from a community point of view, I did not see we were having a negative impact on the labor force, even though it's true, as you pointed out and as has been pointed out, that we were obviously taking people out of the labor force.
 Mr. Camuto never suggested that he, on September 1, 1977, went to meet an emergency or with a specific purpose. He was quoted by the elder Long:
 LONG: So I got my pickup and went down there, and there was three, and I says I said, "Tell me something. What you are folks doing here?"
 Said, "Well, we're trying to help these people."
 I said, "Help them in what respect?"
 He says, "Well, we're trying to find out if they're getting paid right, getting proper food, stuff like that, trying to help them."
 I said, "That's not the way I understand it. I understand you're down here asking those people to make complaints. Is that so?"
 "Yes, that's partially."
 Reference to Camuto's affidavit accompanying the verified Complaint further reinforces the conclusion as to the exclusively general solicitation purposes of Camuto:
 I drove to the nearest migrant farmworker dwelling in order to interview the workers to determine their eligibility for the MSFA services in general and to ascertain particular interests that the farmworkers may have in specific MSFA program (sic).
 On that testimony, I suggest that there is no foundation for holding that Camuto or his employer MSFA prevailed. The plaintiffs, with common counsel, made no effort to separate time spent for each party plaintiff. At a minimum, therefore, on the remand which the majority has decided is proper, it should be limited to Bonnes and FLP-ACLU. As to Camuto and MSFA, affirmance is clearly indicated even on the theory advanced by the plaintiffs and accepted by the majority. At no time did Camuto ever suggest that his organization was interested in specific purpose counseling.
 Turning to Bonnes and FLP-ACLU there was simply a complete failure of proof. Miss Bonnes was not called as a witness, so it is impossible to determine with certainty her purpose in making the September 1, 1977 visit. Besides Camuto, the only other witness for the plaintiffs was Geraty, the FLP-ACLU lawyer in charge of its office and the superior of Miss Bonnes. He, however, had never been to the Long farm. He never received a request for assistance from anyone at the Long farm. He did testify, without details, that Bonnes went on September 1, 1977 in response to a referral, and Camuto similarly recalled generally that such was her purpose. But the judge was not compelled to believe such hearsay and obviously did not. The finding that "the Longs were the prevailing party in this case" establishes that.
 Even accepting that a specific purpose to see a particular farmworker or farmworkers motivated Miss Bonnes in making the September 1, 1977 entry upon the Long farm does not alter matters. The verified Complaint, filed under the oath of Miss Bonnes, states that prior to the confrontation with the Longs:
 Upon arriving at the labor camp, Plaintiffs discovered that the farmworkers who requested the legal assistance were not available.
 That ended, before any "Get off my land" directions from the Longs, any right of Miss Bonnes to remain there without notice. Moreover, the Complaint spells out that she had thereupon proceeded to general solicitation:
 Plaintiffs did begin an interview of another migrant farmworker requesting MSFA services.
 The elder Mr. Long testified about the events of September 1, 1977. He indicated that "he" who must have been Camuto, since the other two were women stated that he was there to solicit, but nothing was said to indicate that Bonnes sought to clarify that she, who came with Camuto, was there for any other purpose. The plaintiffs declined to cross-examine the elder Long at all.
 The testimony of the younger Long was that Bonnes had visited the farm only once before September 1, 1977, on a day about the first of July. His testimony was uncontroverted that she then described her purpose as seeking out migrant workers to whom to give financial assistance so that they might leave and seek other employment.
 Geraty had testified that:
 GERATY: Bonnes, as the outreach worker, visited virtually every migrant labor camp in the two counties and both on a sort of a systematic basis that is, just visiting and providing educational and informational material and also in response to requests for assistance.
 Certainly, in the uncertain state of the record, the district judge was entitled to his inference against the plaintiffs, who had the burden of persuasion. The court's finding of fact reads:
 The Court finds that the cause of such diminution in the labor force of Mr. Blanding is attributable to the manner in which the persons of government and social agencies performed their task.
 And all of these are findings of fact, gentlemen.
 A reading of the record should compel a finding that the Longs were thinking of the visits of Camuto and Bonnes solely in terms of solicitation, and not at all as representing efforts to see a specified individual or individuals for a specific purpose.
 
 
 [3]
 The record is devoid of proof of any emergency situation, on September 1, 1977 or on any other date
 
 
 [4]
 No one should doubt the need for counseling assistance of migrant farmworkers. One should make every reasonable effort to insure that farmers are not permitted to erect barriers precluding easy access by farmworkers to social and legal services. At the same time, one does not materially enhance the rights of one protagonist by disregarding the rights of another. The district judge made findings, fully supported by the record, that the Longs had not acted improperly. It is not open to us to question those findings, however predisposed we may be, in the abstract, to suspect improper action